(No. 4792-■■■■■■

EFFIE TRUAX, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed October 2, 1959.*

*Petition of Claimant for rehearing denied November 16, 1960.*

McMAHON AND PLUNKETT, Attorneys for Claimant.

LATHAM CASTLE, Attorney General; LESTER SLOTT, Assistant Attorney General, for Respondent.

WHAM, J.

Claimant, Effie Truax, 59 years of age, fell on the sidewalk approaching one of the entrances to the Manteno State Hospital on December 30, 1955, and sustained injuries to her person, for which she has claimed damages against the State of Illinois in the sum of $7,500.00, because of respondent's alleged negligence in allowing a crack or raised defect in the sidewalk to exist at the point where she allegedly stumbled and fell.

The principles of law involved are clear, and it is not disputed that claimant, in order to recover in such a case, must prove that she was in the exercise of reasonable care for her own safety at the time of and immediately prior to her falling; that the State of Illinois negligently allowed a dangerous defect to exist in the sidewalk; and that the dangerous defect proximately caused the plaintiff to trip and fall with resulting injuries.

The main question in this case is whether or not the evidence offered satisfies the burden of proof, which is upon claimant. Like so many cases involving a fall,

the owner of the premises, in this instance the State of Illinois through its agents, was not present at the time of the incident, and the occurrence witnesses were those called by claimant.

We have carefully considered the evidence offered, and have found it to be unsatisfactory in several respects.

In the first place, the evidence offered does not contain a satisfactory explanation as to why claimant failed to see and avoid the defect she claims was present. At the time of her injury, approximately 11:45 and in daylight, she was accompanied by a John F. Keeley onto the hospital premises for the purpose of visiting her sister, a patient at the hospital.

After Mr. Keeley had parked his automobile upon the grounds, he and claimant walked to the sidewalk in question, which abutted the Administration Building on the east, and proceeded south thereon a short distance at which time claimant fell.

As an explanation for claimant not seeing the alleged defect upon which she claims to have fallen, claimant relies upon the testimony of both Mr. Keeley and herself. An examination of this testimony reflects a decided conflict between the two. Mr. Keeley testified at page 62 of the transcript on this point as follows:

"Q. As you approached the sidewalk and as you got on the sidewalk and started to walk south, was her attention attracted to anything at that time.

A. Merely three or four people coming in the same direction converging on the east door of the Administration building. They were coming from the northwest. We were coming from the northeast. We arrived right there on the sidewalk, and, as I recall, we let them go first.

Q. Do you know for what reason her attention was attracted to these people?

A. Well, merely so we wouldn't bump into the people. That is about all."

He then testified that she fell when she was about fifteen feet from the door of the Administration Building.

At page 68 of the transcript he testified as follows:

"Q. Where were you in relation to Mrs. Truax when she fell?
A. I was on her immediate left.
Q. You were standing on the side of her?
A. Right on the side, yes, sir.
Q. On her left side?
A. Yes, sir."

At page 88 of the transcript this witness testified as follows:

"Q. By the Commissioner: And you were on her left or right side?
A. I was on her left at this time. I had been on her right as we left the automobile.
The Commissioner: And you were to the left of the point where she fell, is that right?
A. I was closer to the curb, yes.
The Commissioner: Did you have her by the arm then?
A. No, sir, I had her by the arm until we got to the sidewalk.
The Commissioner: How far away were you from her when she stumbled?
A. A matter of an inch. I was perhaps touching her garment, I was so close."

On the other hand, Mrs. Truax's testimony on this point at page 95 of the transcript reads as follows:

"Q. After you reached this sidewalk abutting the east side of the Administration Building, what did you do, if anything?
A. We turned south to walk to the stairway.
Q. Then what happened?
A. There were people passing with us, a couple of people, and then people coming directly towards me.
Q. And as you walked south—
A. As I walked south, these people directly in front of me weren't paying any attention. I started to get out of the way to keep from bumping into them, and my toe caught on this raise or rise in the walk. It was broken, and it was a jagged edge and broken, and I stumbled and fell.
Q. Just prior to your fall where were you with reference to Mr. Keeley?
A. He was on my left side."

At pages 99 and 100 of the transcript she testified as follows:

"Q. As you reached the sidewalk and started to walk south, you say your attention was attracted to these pedestrians is that correct?
A. Yes, that is true.
Q. And why was your attention attracted to them?

A. Well, because they were coming directly toward me, and they didn't —they weren't paying any attention to anybody except themselves and coming directly towards me, and I knew in order to keep from bumping them I had to step aside. In stepping aside, I didn't have any opportunity to look down. I just tripped."

And again at page 119 of the transcript she testified as follows:

"Q. Did you notice the sidewalk prior to your falling, Mrs. Truax?

A. No, I didn't. We had just barely stepped up on the sidewalk, and the people were coming toward us, and I had no opportunity of seeing the sidewalk any more than as I stepped up on it, it was clear, but after I turned to go south, I had no opportunity of noticing.

Q. How far had you proceeded on the sidewalk from the street or the curb to where you fell?

A. I would say just a few steps.

Q. Just a few steps?

A. Yes.

Q. How far were these people away who were approaching you?

A. Just about the same. As we stepped up, they were coming directly toward us.

Q. I say, about how far from you?

A. I would say perhaps three feet.

Q. Three feet?

A. Three or four feet.

Q. Three or four feet, approximately?

A. Approximately, yes.

Q. Were you facing them directly?

A. Yes, I was.

Q. And they were facing you directly?

A. That is right.

Q. How many people were there?

A. Three.

Q. And the sidewalk crack was in between you and them?

A. Right. They were just about, I would think now, they were possibly just about on that crack, but I noticed they were coming toward us, because they couldn't have gone very far.

Q. They were on the crack when you first noticed them?

A. Just about.

Q. What happened after that?

A. When I stepped out to go around them, because I didn't want to bump into them, my toe caught in the crack and away I fell.

Q. If they were on the crack, and you stepped around them, where were you in relation to the curb?

A. Well, let me see. I couldn't have taken more than three steps on that sidewalk, and as I looked up these people were coming directly toward me. I didn't look down at all. I watched them, because I felt I didn't want

to bump right into them, and they were concentrating on some kind of conversation, and I stepped to one side to keep from bumping into them. As I stepped around them, I fell, and I presume they must have been awfully close to the crack.

Q. You don't know if they were on the crack?

A. No, I don't really know."

It is significant from this testimony that claimant is not corroborated by her witness Keeley as to the reason she did not see the defect. It seems to us that, if three people had been bearing down on the claimant in the manner she stated they were, her companion, who was walking closely beside her and practically touching her, would have seen these persons. His testimony makes no reference whatsoever to any pedestrians on the sidewalk other than those walking south. His explanation that her attention was attracted to those pedestrians also proceeding south is not persuasive. At the most, this is a conclusion on his part, and is, in effect, negatived by claimant herself, who makes no contention that the southbound pedestrians distracted her.

Moreover, the testimony of claimant that she had walked up on the sidewalk at a point not more than three steps from the alleged defect without seeing it indicates to us that she was not paying a great deal of attention to the place she intended to walk, since it is rather obvious she would have seen it, if she had looked down as she stepped up over the curb onto the sidewalk.

We can come to no other conclusion than that her excuse for failing to see the defect is more speculation than fact, and is not persuasive.

In the second place, the evidence offered regarding the location of the alleged defect with respect to claimant's position when she fell is likewise not satisfactory. The photographs offered in evidence by claimant, taken by her witness, Mr. Keeley, some six or seven months after claimant was injured, and the testimony regarding

same, establish the location of a raised place beginning at the curbing of the sidewalk and running west a foot or more in length. Claimant marked a point on the photographs, designated as claimant's exhibits Nos. 23 and 24, indicating where she fell. The marks placed by claimant on these photographs are very near the curb, and appear to be considerably less than one foot from the curb.

The witness Keeley marked on claimant's exhibit No. 25, a photograph of the alleged defect, the place where she stumbled. It likewise was close to the curb, and in the same relative position as claimant had indicated. He characterized the mark he made as being approximately two feet from the curb.

Both Mr. Keeley and claimant were walking on the sidewalk according to their testimony, with Mr. Keeley being next to the curb and claimant to his immediate right. Claimant testified that she "started to get out of the way to keep from bumping into" the persons directly approaching her from the south, when she caught her foot on the curb and fell.

It is obvious she could have gone only one way in attempting to avoid three people coming directly toward her, namely, to the west or away from the curb. It is obvious that Mr. Keeley was occupying the foot or two of sidewalk immediately adjacent to the curb. Such a position occupied by the witness Keeley would make it physically impossible for claimant to trip at the point indicated by both of these witnesses.

We also note on this question of the location of the place where claimant fell Mr. Keeley's testimony at page 49 of the transcript:

"Q. As you started to walk south on this sidewalk abutting the east side of the Administration Building, did anything unusual happen?

A. Yes. As we were walking south Mrs. Truax hit the curb a sharp resound and fell to the ground."

We feel that the evidence regarding the place of claimant's fall, and the causal connection between the alleged defect and the fall is speculative and unclear.

In the third place, we are not satisfied with respect to the evidence regarding the size of the alleged defect. Claimant in describing it stated at page 98 of the transcript as follows:

"Q. Can you tell the Court about the dimensions of this rise; how high was it?

A. I would say about two inches.

Q. Approximately how wide was it?

A. I would say about twelve inches wide, twelve or fourteen inches."

She saw it on only two occasions—the day she fell, and six months later at the time Mr. Keeley took the photographs. On the first of these occasions she was in great pain from her injuries and almost delirious according to Mr. Keeley.

The witness Keeley testified at page 50 of the transcript with respect to the size of the defect as follows:

"Q. Tell the Court about the dimensions of this rise. For instance, how high was it?

A. It was approximately two inches tall.

Q. How many inches would you say it was in width or how many feet for that matter?

A. It was at least a foot in width, at least a foot."

At page 70 of the transcript he testified as follows:

"Q. How deep a crevice or obstruction would you say this crack created?

A. It was at least two inches above the ground for a length of a foot.

Q. It ran a foot, is that correct?

A. It ran a little further, but it diminished in height after that.

Q. It diminished in height after that?

A. Yes, sir."

He further testified that he had seen it for approximately two or three years prior to the accident, and that the photographs admitted into evidence on behalf of claimant were correct representations of the conditions.

Neither claimant nor the witness Keeley testified that they actually measured the height of the crack. We, therefore, presume their statements regarding the height of the defect represent their estimate of the height without measuring it.

We have examined these photographs, and they do not appear to us to reflect a crack two inches in height.

Respondent offered as exhibit No. 14 a Departmental Report, which was admitted into evidence, and which reads in part as follows:

"Claimant proceeded west from the parking area to the sidewalk abutting the east side of the Administration Building, and then proceeded south along that sidewalk to a point approximately 37½ feet south of the northeast corner of that sidewalk where she fell. This was a short distance north of the east entrance to the Administration Building. This sidewalk is the main sidewalk in front of the Administration Building, traversed by most visitors, many employees and many patients. The average number of persons using this walk in a given month would be approximately 400 per day. No accidents of the type referred to in the complaint herein have ever occurred on that sidewalk except the one referred to in the complaint. The sidewalk in front of the Administration Building is six feet in width at the place where claimant fell.

"It appears that claimant stumbled at the location of a normal expansion joint in the sidewalk between which asphalt tar had been poured, and at which there was a slight rise of one of the blocks at the joint over the other, not exceeding at any point the height of one-half inch."

Photographs were attached to the Departmental Report and admitted into evidence. Several of these photographs show the crack to be less than the height of a quarter, which is shown in the photographs, and less than the thickness of a package of cigarettes.

The only evidence offered to refute this evidence is the witness Keeley, who stated that none of the photographs offered by respondent portrayed a true photographic representation of the rise at the time of the accident.

We have compared the photographs of claimant and respondent, and they appear to us to be of the same area and show the same crack, although respondent's are

taken from a different angle, and are considerably more clear cut in detail.

If the Departmental Report is correct, and the crack only one-half inch in height, then the defect complained of is not, in our judgment, a sufficiently dangerous condition upon which to base a recovery under the circumstances, conditions and locations involved in this case.

It is common knowledge that every city in the country has an untold number of defects and cracks in its sidewalks of such a nature, and that it would be an endless task to level all one-half inch rises at expansion joints. Although it is true that on city sidewalks pedestrians are entitled to a reasonably safe condition for travel, by the same token they are not entitled to perfection. The test of reasonableness is a two-fold test. The state in maintaining its sidewalks needs only to exercise reasonable care—no more and no less. In our judgment it would be unreasonable to require the state to repair every one-half inch crack in its sidewalks. Such a requirement would fasten upon the state the duty of an insurer, which is not now, nor should it ever be, the law.

In our judgment, in view of the conflict in the evidence noted above regarding the size of the alleged defect, we do not believe that claimant has borne the burden of establishing a dangerous defect.

After weighing all of this evidence in our capacity of judging the facts as well as the law, we do not feel that claimant has borne the burden of proving the essential elements of her case.

We, therefore, find that this claim should be denied.